IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| KEITH BERNARD SHANK | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| ANDREW SAUL, Commissioner of Social Security | : | NO.  19-5122 |
| | : | |

**MEMORANDUM AND ORDER**

ELIZABETH T. HEY, U.S.M.J.                                                                April 9, 2021

Keith Bernard Shank ("Plaintiff") seeks review of the Commissioner's decision denying his application for disability insurance benefits ("DIB").  For the reasons that follow, I conclude that the decision of the Administrative Law Judge ("ALJ") is not supported by substantial evidence and remand for further proceedings pursuant to sentence four of 42 U.S.C. § 405(g).

**I.     PROCEDURAL HISTORY**

Plaintiff filed for DIB on June 14, 2016, tr. at 139-40, alleging that his disability began on June 5, 2016,[1] as a result of quadruple bypass surgery and coronary artery disease.  Id. at 169.  Plaintiff's application for benefits was denied initially, id. at 77-81, and Plaintiff requested a hearing before an ALJ, id. at 82, which took place on June 11, 2018.  Id. at 35-61.  On September 26, 2018, the ALJ found that Plaintiff was not disabled.  Id. at 15-29.  The Appeals Council denied Plaintiff's request for review on

---

[1] In his original application, Plaintiff alleged disability as of May 15, 2016.  Tr. at 139.  He filed an amendment to the application on December 9, 2016, alleging disability as of June 5, 2016.  Id. at 141.

September 4, 2019, id. at 1-3, making the ALJ's September 26, 2018 decision the final decision of the Commissioner. 20 C.F.R. § 404.981.

Plaintiff commenced this action in federal court on October 31, 2019, Doc. 2, and the matter is now fully briefed and ripe for review. Docs. 14 & 15.[2]

## II.  LEGAL STANDARD

To prove disability, a claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for . . . not less than twelve months." 42 U.S.C. § 423(d)(1). The Commissioner employs a five-step process, evaluating:

> 1.  Whether the claimant is currently engaged in substantial gainful activity;
>
> 2.  If not, whether the claimant has a "severe impairment" that significantly limits his physical or mental ability to perform basic work activities;
>
> 3.  If so, whether based on the medical evidence, the impairment meets or equals the criteria of an impairment listed in the listing of impairments ("Listings"), 20 C.F.R. pt. 404, subpt. P, app. 1, which results in a presumption of disability;
>
> 4.  If the impairment does not meet or equal the criteria for a listed impairment, whether, despite the severe impairment, the claimant has the residual functional capacity ("RFC") to perform his past work; and

---

[2] Defendant consented to magistrate judge jurisdiction pursuant to 28 U.S.C. § 636(c). See Standing Order, In RE: Direct Assignment of Social Security Appeal Cases to Magistrate Judges (Pilot Program) (E.D. Pa. Sept. 4, 2018). Plaintiff is deemed to have consented based on his failure to file the consent/declination form and the notices advising him of the effect of not filing the form. Docs. 3, 4 & 5.

> 5. If the claimant cannot perform his past work, then the final step is to determine whether there is other work in the national economy that the claimant can perform.

See Zirnsak v. Colvin, 777 F.3d 607, 610 (3d Cir. 2014); see also 20 C.F.R. § 404.1520(a)(4).  Plaintiff bears the burden of proof at steps one through four, while the burden shifts to the Commissioner at the fifth step to establish that the claimant is capable of performing other jobs in the local and national economies, in light of his age, education, work experience, and RFC.  See Poulos v. Comm'r of Soc. Sec., 474 F.3d 88, 92 (3d Cir. 2007).

The court's role on judicial review is to determine whether the Commissioner's decision is supported by substantial evidence.  42 U.S.C. § 405(g); Schaudeck v. Comm'r of Soc. Sec., 181 F.3d 429, 431 (3d Cir. 1999).  Therefore, the issue in this case is whether there is substantial evidence to support the Commissioner's conclusion that Plaintiff is not disabled.  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," and must be "more than a mere scintilla."  Zirnsak, 777 F.2d at 610 (quoting Rutherford v. Barnhart, 399 F.3d 546, 552 (3d Cir. 2005)).  The court has plenary review of legal issues.  Schaudeck, 181 F.3d at 431.

### III.   DISCUSSION

#### A.   ALJ's Findings and Plaintiff's Claims

The ALJ found that Plaintiff suffered from the severe impairments of coronary artery disease status-post non-ST-elevation myocardial infarction, hypertension, affective disorder, and anxiety disorder, and also found that Plaintiff's obesity, right shoulder

disorder, and sinus bradycardia were not severe impairments. Tr. at 17-18. The ALJ found that Plaintiff's low back pain was not a medically determinable impairment. Id. at 18. The ALJ next found that Plaintiff did not have an impairment or combination of impairments that met the Listings, id. at 19-21, and that Plaintiff retained the RFC to perform light work with the following limitations: no climbing of ropes, ladders, or scaffolds; he can perform other postural activities no more than occasionally; no more than frequent reaching; no more than occasional exposure to unprotected heights, moving mechanical parts, extreme temperatures, humidity, vibration, and dust, odors, fumes, or pulmonary irritants; and he is limited to performing routine tasks, making simple work-related decisions, and no more than frequent interaction with supervisors, co-workers, and the public. Id. at 21. The ALJ then found that Plaintiff could not perform his past relevant work as a cook, mixing-machine tender, stock clerk, truck driver, garbage collector, or shipping and receiving clerk. Id. at 26-27. Finally, based on the testimony of a vocational expert ("VE"), the ALJ found that Plaintiff could perform work as a marker, router, or routing clerk, and is therefore not disabled. Id. at 28.

Plaintiff claims that the ALJ erred in failing to (1) properly evaluate the opinions of Plaintiff's treating physicians, (2) properly evaluate Plaintiff's complaints of pain and other symptoms, and (3) convey all of the functional limitations established by the record in questioning the VE. Doc. 14 at 10-20. Defendant responds that the ALJ correctly considered the opinion evidence and Plaintiff's testimony and included the medically supported limitations in the hypothetical posed to the VE, resulting in a decision that was supported by substantial evidence. Doc. 15.

B.     **Plaintiff's Claimed Limitations**

Plaintiff was born on August 23, 1965, making him 50 years old at the time of his application and 53 years old at the time of the ALJ's decision.  Tr. at 139.  He completed the twelfth grade and has worked as a cook, mixing-machine tender, stock clerk, truck driver, forklift operator, garbage collector, and shipping and receiving clerk.  Id. at 40-44, 56-57, 170.

At the administrative hearing, Plaintiff testified that he stopped working in June 2016, when he had a heart attack.  Tr. at 44.  During the hearing he complained of severe chest tightness, shortness of breath, dizziness, and an inability to stand or sit for very long.  Id. at 45.  Plaintiff testified that he can walk for a half a block and then must rest, sit for ten minutes before he starts to tighten up, and can lift less than five pounds.  Id. at 46-48.  He walks with a cane for balance, needs help with personal needs, and is unable to reach upwards without pain.  Id. at 48-49.  Plaintiff's antidepressants cause his drowsiness and he explained that two hours after waking up, he is ready to go back to bed and normally takes two naps a day lasting two to three hours.  Id. at 51-52.

C.     **Summary of the Medical Record**[3]

Plaintiff went to the Springfield Hospital Emergency Room on June 5, 2016, complaining of recurring chest pain that recently worsened, and was admitted for testing.  Tr. at 317-18.  A cardiac catheterization revealed stenosis in several vessels in the heart.

---

[3]Because Plaintiff's claims primarily involve the alleged limitations imposed by his cardiac impairments, primarily his fatigue and pain post bypass surgery, I focus on the medical evidence relevant to his cardiac condition.

Id. at 259, 321, 613. Charles Geller, M.D., of Cardiac and Thoracic Surgeons, performed quadruple aortocoronary artery bypass surgery on June 8, 2016, id. at 326, and four days later Plaintiff was discharged to his home. Id. at 320-21. HAN Cardiovascular Group began treating Plaintiff for his cardiac care after his discharge. On June 29, 2016, Samuel Ruby, M.D., diagnosed Plaintiff with coronary artery disease status post coronary artery bypass grafting ("CABG"), benign essential hypertension, and dyslipidemia. Id. at 307-08. At that time, Plaintiff complained of "severe fatigue at times," muscle weakness, and shortness of breath on exertion. Id. at 305-07. Dr. Geller noted similar complaints on July 5, 2016. Id. at 464. Shortly after starting cardiac rehabilitation in August 2016, Plaintiff began complaining of pain in his chest, neck, and between his shoulder blades and his complaints of shortness of breath continued. Id. at 301. Dr. Ruby opined that the pain may be Dressler's Syndrome,[4] and recommended Plaintiff take ibuprofen every eight hours for a week. Id. at 303. The doctor also diagnosed Plaintiff with sinus bradycardia secondary to his beta blockers.[5] Id. On October 6, 2016, Dr. Ruby noted that Plaintiff's chest pain had alleviated and that he had only mild shortness of breath on exertion. Id. at 297. On December 16, 2016, Dr. Ruby noted Plaintiff's complaints of fatigue and mild shortness of breath on exertion. Id. at 510. In a letter to Plaintiff's primary care physician after on office visit on October 24, 2017, Dr. Ruby noted that

---

[4]Dressler's Syndrome, also called post-myocardial infarction syndrome, is pericarditis with fever, leukocytosis, pleurisy, and pneumonia occurring after myocardial infarction. Dorland's Illustrated Medical Dictionary, 32nd ed. (2012) ("DIMD") at 1844.

[5]Sinus bradycardia is a slow sinus rhythm, with a heart rate of less than 60 beats per minute in an adult. DIMD at 245.

Plaintiff continued to complain of fatigue, shortness of breath, and atypical chest pain. Id. at 614. The doctor noted a normal EKG and, based on other testing, concluded that there was "little to support that this patient's limitations are cardiac in origin." Id. Dr. Ruby recommended cardiac imaging including a 2-D echo and nuclear stress testing. Id.

On January 16, 2018, Dr. Ruby conducted a pharmacologic stress test with an "abnormal" result "which suggest[s] the possibility of a lateral wall ischemia." Tr. at 572.[6] In addition, he noted a "left ventricular ejection fraction of 52% without obvious regional wall motion abnormality." Id.[7]

As noted, Plaintiff began cardiac rehabilitation in August 2016, about two months following his bypass surgery. Tr. at 430, 435. At his initial evaluation at Springfield Hospital Cardiac Rehab Program, Plaintiff reported that his whole body hurt since surgery, but he had no balance disturbance, cognitive impairment, dizziness, or gait

---

[6]Myocardial ischemia is a deficiency of blood supply to the heart muscle due to obstruction or constriction of the coronary arteries. DIMD at 961.

[7]     Ejection fraction (EF) refers to how well your left ventricle (or right ventricle) pumps blood with each heart beat. Most times, EF refers to the amount of blood being pumped out of the left ventricle each time it contracts. The left ventricle is the heart's main pumping chamber.
     Your EF is expressed as a percentage. An EF that is below normal can be a sign of heart failure. . . .
     If you have heart failure it means that your heart is not working as well as it should. A normal left ventricular ejection fraction (LVEF) ranges from 55% to 70%. An LVEF of 65%, for example, means that 65% of the total amount of blood in the left ventricle is pumped out with each heartbeat.

See https://my.clevelandclinic.org/health/articles/16950-ejection-fraction (last visited March 8, 2021)

disturbance, and that he suffered from depression. Id. at 432. After three visits, he complained of chest wall incisional pain, shortness of breath on exertion, and feeling "wash[ed] out." Id. at 425. Plaintiff had some improvement of the chest wall pain with ibuprofen, but began complaining of neck and shoulder pain on August 17, 2016. Id. at 422. Also in August 2016 Plaintiff was evaluated by psychiatrist, Dr. Burkat, and diagnosed with major depressive disorder and prescribed Zoloft.[8] Id. at 264, 422. On October 4, 2016, Plaintiff complained of fatigue. Id. at 420. Plaintiff completed the cardiac rehabilitation program after 36 sessions on November 4, 2016. Id. at 337. The discharge notes indicate that Plaintiff had improved his functional capacity and diet, but remained depressed. Id. at 339. He was discharged with a home exercise plan to use a stationary bike/elliptical and weights. Id.

Plaintiff's primary care physician was Christopher Hannum, M.D. Tr. at 227-81, 611-17. After Plaintiff's bypass surgery, he complained to Dr. Hannum of chest pain and fatigue. Id. at 232 (6/28/16 – chest pain), 231 (8/23/16 – chest and shoulder pain), 230 (10/19/16 – chest pain and reduced exercise tolerance), 611 (4/24/17 – chest soreness and tightness and increased fatigue), 612 (9/28/17 – chest tightness and shortness of breath).

Dr. Hannum completed a Disability Impairment Questionnaire on April 24, 2017, tr. at 516-20, noting diagnoses of coronary artery disease, status-post myocardial

---

[8]Zoloft is an antidepressant. See https://www.drugs.com/search.php?searchterm=zoloft (last visited March 10, 2021).

infarction and quintuple coronary bypass surgery,[9] and depression, and indicating that Plaintiff could perform work in a seated or standing/walking position less than an hour a day, and was able to lift or carry only five pounds. Id. at 516-18. Dr. Hannum also opined that Plaintiff's pain and fatigue would frequently interfere with his attention and concentration, that he would have to take unscheduled breaks every two hours for fifteen minutes, and that he would be absent from work more than three times a month. Id. at 519.[10] The doctor characterized Plaintiff as "totally incapacitated and permanently disabled." Id. at 520.

Dr. Ruby completed a similar questionnaire on June 14, 2017, tr. at 503-08, noting diagnoses of hypertension, dyslipidemia, bradycardia, shortness of breath, and chest pain. Id. at 503. Dr. Ruby opined that Plaintiff could perform a job in a seated position for five hours in an eight-hour workday, and standing or walking for three hours in an eight-hour workday, finding that he could frequently lift or carry up to ten pounds and occasionally up to twenty pounds. Id. Dr. Ruby agreed with Dr. Hannum's assessment that Plaintiff's pain and fatigue would interfere with his concentration and attention and that his condition would likely require him to take unscheduled breaks at work. Id. at 506-07.

Although the record does not include any mental health treatment records, Reuben Cespon, M.D., completed a Mental Impairment Questionnaire indicating that since

---

[9]Dr. Geller, who performed the surgery, referred to it as quadruple bypass surgery. Tr. at 326.

[10]Dr. Hannum also completed additional notes/letters indicating that Plaintiff was disabled. Tr. at 498 (Return to Work Certificate dated 6/28/16), 533 (letter of disability dated 9/29/17).

August 2016 he had provided monthly mental health treatment to Plaintiff for Major Depression, recurrent, and anxiety, including prescribing fluoxetine for both conditions.[11]. Tr. at 524-28. The doctor indicated that Plaintiff had none -to- mild limitations in most of the categories, but had moderate limitations in interacting with the public and maintaining socially appropriate behavior. Id. at 527. In addition, Dr. Cespon indicated that Plaintiff would be absent from work two to three times a month due to his impairments and/or treatment. Id. at 528.

At the initial determination level, after reviewing Plaintiff's records, Harshadkumar Patel, M.D., found that Plaintiff could occasionally lift and carry twenty five pounds, frequently lift and carry ten pounds, stand and/or walk for six hours in an eight-hour day, and sit for six hours in a workday. Tr. at 67. Based on his review of the record, Plaintiff could occasionally climb ramps, stairs, ladders, ropes, and scaffolds; balance; stoop; kneel; crouch; and crawl. Id. The initial determination did not include any analysis of Plaintiff's mental health impairments.

### D.     Consideration of Plaintiff's Claims

Plaintiff first complains that the ALJ failed to properly evaluate the opinions of Plaintiff's treating physicians. Doc. 14 at 10-16. Defendant responds that the ALJ properly considered the opinion evidence, giving equal weight to Drs. Ruby and Patel, and providing sufficient reasoning to support the weight given to each opinion. Doc. 15 at 4-6.

---

[11]Fluoxetine is an antidepressant. See https://www.drugs.com/fluoxetine.html (last visited March 10, 2021).

Generally, the governing regulations dictate that an ALJ must give medical opinions the weight he deems appropriate based on factors such as whether the physician examined or treated the claimant, whether the opinion is supported by medical signs and laboratory findings, and whether the opinion is consistent with the record as a whole. 20 C.F.R. § 404.1627(c).[12] "The ALJ must consider all the evidence and give some reason for discounting the evidence [he] rejects." Plummer v. Apfel, 186 F.3d 422, 429 (3dCir. 1999) (citing Stewart v. Sec'y HEW, 714 F.2d 287, 290 (3d Cir. 1983)). When there is a conflict in the evidence, the ALJ may choose which evidence to credit and which evidence not to credit, so long as he does not "reject evidence for no reason or for the wrong reason." Rutherford v. Barnhart, 399 F.3d 546, 554 (3d Cir. 2005); Plummer v. Apfel, 196 F.3d 422, 429 (3d Cir. 1991); see also 20 C.F.R. § 404.1527(c)(4) ("Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion."). When a treating physician's opinion is not accorded controlling weight, the ALJ should consider a number of factors in determining how much weight to give it including the examining relationship (more weight accorded to an examining source), the treatment relationship (including length and nature of the treatment relationship), supportability, consistency, specialization, and other factors. 20 C.F.R. § 404.1527(c)(1)-(6).

---

[12]Effective March 27, 2017, the Social Security Administration amended the regulations regarding the evaluation of medical evidence, eliminating the assignment of weight to any medical opinion. See Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5844 (Jan. 18, 2017). Because Plaintiff's application was filed prior to the effective date of the new regulations, the opinion-weighing paradigm is applicable.

As previously discussed, Dr. Hannum opined that Plaintiff's impairments imposed significant restrictions on Plaintiff's abilities. See supra at 9 (citing tr. 516-20). Dr. Ruby opined that Plaintiff was capable of greater exertional activities, but that he would likely require unscheduled breaks and his fatigue and other symptoms would frequently interfere with his concentration and attention. See supra at 9-10 (citing tr. at 503-08). Although Dr. Cespon found only moderate limitations in two distinct areas of social interaction based on Plaintiff's mental health impairments, he also noted Plaintiff would likely be absent from work two or three times a month due to his impairments. See supra at 10 (citing tr. at 524-28).[13] Dr. Patel, the state agency reviewer, found weight restrictions similar to Dr. Ruby, a greater ability to sit, stand, and walk during the work day, and made no reference to the need for breaks or absences. See supra at 10 (citing tr. at 67).

The ALJ afforded Dr. Patel's opinion significant weight, to the extent the doctor found Plaintiff was capable of light work[14] "as it is consistent with the medical evidence

---

[13] To the extent Plaintiff argues that these doctors' opinions were entitled to controlling weight, I disagree. The opinion of a treating physician is entitled to controlling weight when the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the record. 20 C.F.R. § 404.1527(c)(2). Here, there are significant inconsistencies between the opinions of Drs. Hannum and Ruby concerning Plaintiff's abilities, and, as will be discussed, additional cardiac testing results, see tr. at 613-14, cast doubt on the accuracy of some of the opinion evidence. Thus, I conclude that no doctor's opinion is entitled to controlling weight.

[14] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or

of record," but afforded little weight to the doctor's conclusion that Plaintiff could occasionally climb ladders, ropes, or scaffolds and could perform unlimited reaching because "Dr. Patel was not familiar with the case record that indicates symptoms and treatments that would limit [Plaintiff] in climbing and reaching." Tr. at 24. The ALJ gave partial weight to Dr. Ruby's opinion, relying on "Dr. Ruby's physical examinations of [Plaintiff] that indicate normal cardiovascular, musculoskeletal, and neurologic findings." Id. at 26. In affording Dr. Hannum's findings of disability and his assessment "little weight," the ALJ relied on Dr. Ruby. "Dr. Hannum's opinion is inconsistent with and discounted by [Plaintiff's] treating cardiologist, Dr. Ruby, who refused [Plaintiff's] request for support of his Social Security disability, stated that additional testing needed to be done, and stated that there was no cardiac basis to support Dr[.] Hannum's opinion that [Plaintiff] is permanently and totally incapacitated." Id. at 25 (citing id. at 564).

Plaintiff argues that "Dr. Ruby did not disagree with Dr. Hannum's conclusions, but instead indicated that he required additional information and objective testing." Doc. 14 at 12. In fact, based on the information that was available at the time, Dr. Hannum's assessment was significantly more restrictive than that of Dr. Ruby. Dr. Hannum found that Plaintiff could sit and stand/walk for less than an hour each in and eight-hour workday and could lift no more than five pounds, tr. at 518, whereas Dr. Ruby found Plaintiff able to perform a job in a seated position for five hours and walk or stand or

---

standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls." 20 C.F.R. § 404.1567(b).

three hours in an eight-hour workday with frequent lifting and carrying of ten pounds and occasional lifting and carrying totaling fifty pounds. Id. at 505.

Dr. Ruby's indication that additional objective testing was required, however, is the lynchpin of this case. The problem with the ALJ's consideration of the opinions from Drs. Patel, Hannum, and Ruby is timing. Each of the doctors offered his opinion prior to the abnormal stress test in early 2018. See tr. at 67-68 (Dr. Patel – 12/7/16), id. at 516-20 (Dr. Hannum – 4/24/17), id. at 503-08 (Dr. Ruby – 6/14/17). The abnormal stress test took place on January 16, 2018, id. at 572, more than a year after Dr. Patel's assessment and more than six months after the assessments of Drs. Hannum and Ruby. This time lapse is especially concerning considering that Dr. Ruby could not answer some parts of the questionnaire indicating, "Can't say for sure." Id. at 507. Similarly, in a letter to Dr. Hannum, Dr. Ruby indicated that he could not endorse Plaintiff's "disability request without further cardiac testing," including testing to "redefine left ventricular systolic function as well as a stress test to determine the functional status of his coronary circulation." Id. at 613.

> At present his EKG is normal. The last evaluation of left ventricular systolic function suggested normal left ventricular ejection fraction. There is nothing on his examination or by 2-D echo to suggest valvular pathology. I have therefore little to support that this patient's limitations are cardiac in origin. I would again suggest repeat cardiac imaging and including a 2-D echo and nuclear stress testing. Since the patient uses a cane . . . he would need a pharmacologic stress test. I have reviewed a letter by Dr. Christopher Hannum, M.D., dated 09/29/2017, suggesting that the patient is permanently and totally incapacitated and disabled. This may be in fact true, but there is nothing to suggest that this is based on a cardiac cause.

<u>Id.</u> at 614.

At the hearing, after Plaintiff's testimony concerning his continuing daily symptoms of chest tightness, shortness of breath, and sharp chest pains, the ALJ had the following exchange with Plaintiff's counsel, which acknowledged the importance of the most recent testing:

> ALJ:  All right.  I did have -- I wanted to ask you, we have -- let me pull it up. . . .  So there's a recent stress test from January.
> ATTY:  Yes.
> ALJ:  It's 14F, at 36 [<u>tr.</u> at 572].  Has there been any office visits with the cardiologist since then?
> ATTY:  Not that I'm aware of.  I believe that would --
> ALJ:  Because we have the visit from October, where the cardiologist was saying that he needs more testing before he could render an opinion about --
> ATTY:  Right
> ALJ:  -- the disability from a cardiology standpoint.  And then it -- he was saying well, the Claimant hasn't had the testing done.  And now it looks like in January, he had at least the stress test done, which showed an abnormality.
> ATTY:  Right.
> ALJ:  It showed an ejection fraction of 52%.  And I guess what I was wondering, is has there been that post stress follow-up with Dr. Ruby?
> CLMT:  No.  Because at the time, after I had that stress test, I didn't have any coverage, so I couldn't go in the doctor's office, because I couldn't pay a doctor's fee.
> ATTY:  But, Judge, it's funny, I actually made a note of that, that it seemed like he couldn't make – he couldn't really opine on what the limitations were, because he needed to see additional testing.  So I absolutely get your point, as it relates to that stress test.  It's almost like he's waiting for that, to be able to make a determination.
> ALJ:  All right.  Well, and certainly, I mean, the test itself, the results show an abnormality and an ejection fraction that's not ideal.

Tr. at 53-54. Although the ALJ acknowledged the January 2018 test result in his opinion, id. at 24, he did not reference it again when weighing Dr. Ruby's opinion. Id. at 25-26.

Some of the testing that Dr. Ruby sought is now part of this record, and it evidenced "the possibility of a lateral wall ischemia," and reduced left ventricular ejection fraction. Tr. at 572. Under the circumstances, it was inappropriate for the ALJ to rely on Dr. Ruby's assessment and prior letter to discount Dr. Hannum's assessment, at least not without further clarification from Dr. Ruby. Likewise, it was inappropriate to rely on Dr. Patel's RFC assessment as Dr. Patel relied on Plaintiff's normal testing results including a normal ejection fraction. Id. 68. None of the doctors had the abnormal test result when they opined on Plaintiff's RFC. As such, I will remand the case for further consideration.[15]

Reconsideration of the medical evidence will impact the ALJ's consideration of Plaintiff's complaints of fatigue and pain, and impact the ALJ's RFC determination and the questioning of the VE. Therefore, I need not address the other claims presented in Plaintiff's brief.

## IV.   CONCLUSION

The medical opinions upon which the ALJ relied in formulating Plaintiff's RFC predated a key piece of medical evidence that Plaintiff's cardiologist had identified as necessary to complete the functional questionnaire. Therefore, I conclude that the ALJ's

---

[15]When the evidence in the record, including medical opinions, is inconsistent or a disability determination cannot be made based on the evidence, the governing regulations allow the ALJ to recontact a medical source, request additional existing evidence, or require the claimant to undergo a consultative evaluation. 20 C.F.R. § 404.1520b(b)(2).

RFC determination is not supported by substantial evidence. I will, therefore, remand the case for further consideration in light of the results of the January 16, 2018 stress test.

An appropriate Order follows.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| KEITH BERNARD SHANK | : | CIVIL ACTION |
| v. | : | |
| ANDREW SAUL, Commissioner of Social Security | : | NO. 19-5122 |

**O R D E R**

AND NOW, this 9th day of April, 2021, upon consideration of Plaintiff's request for review (Doc. 14), the response (Doc. 15), and after careful consideration of the administrative record (Doc. 13), IT IS HEREBY ORDERED that:

1. Judgment is entered REVERSING the decision of the Commissioner of Social Security for the purposes of this remand only and the relief sought by Plaintiff is GRANTED to the extent that the matter is REMANDED for further proceedings consistent with this adjudication; and

2. The Clerk of Court is hereby directed to mark this case closed.

BY THE COURT:

/s/ ELIZABETH T. HEY

_____
ELIZABETH T. HEY, U.S.M.J.